IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
July 7, 2015 Session

**FREDERICK GREENE v. STATE OF TENNESSEE**

**Appeal from the Criminal Court for Shelby County**
**No. 0905927     James C. Beasley, Jr., Judge**

_____

**No. W2014-01216-CCA-R3-PC  -  Filed November 19, 2015**

_____

The petitioner, Frederick Greene, was convicted of first degree (premeditated) murder and received a sentence of life imprisonment.  The petitioner appeals the denial of his petition for post-conviction relief.  On appeal, he contends that he received ineffective assistance of counsel.  Following our review, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

JOHN EVERETT WILLIAMS, delivered the opinion of the Court, in which THOMAS T. WOODALL, P.J., and ROGER A. PAGE, J., joined.

Lance R. Chism, Memphis, Tennessee, for the Appellant, Frederick Greene.

Herbert H. Slatery III, Attorney General and Reporter; David H. Findley, Assistant Attorney General; Amy. P. Weirich, District Attorney General; and Stacy McEndree, Assistant District Attorney General, for the Appellee, State of Tennessee.

**OPINION**

# FACTS AND PROCEDURAL HISTORY

On direct appeal, this court recited the facts from the petitioner's trial as follows:

Tikieta Williams testified that on February 11, 2009, she lived in a house at 766 Rosemont in Memphis with her children and grandchildren. She had previously been in a romantic relationship with [the petitioner], and [the petitioner] moved into the house with Tikieta[1] when she bought it in the summer of 2007 after the pair lived for a few weeks with Marcus and Lakeydra Brown, [the petitioner's] brother-in-law and sister, at a nearby house on Rosemont. [The petitioner] lived at Tikieta's house for approximately one year, in which time he would be there "on and off," staying for a few days at a time. By the summer of 2008, Tikieta and [the petitioner] had ended their relationship, and [the petitioner] was no longer welcome to stay at the house.

Tikieta testified that [the petitioner] came to her house unexpectedly on the morning of February 11, 2009. He was not working and was "moving around from place to place." He asked to leave some of his clothes at Tikieta's house, which Tikieta allowed, but she told him that he could not stay there. One of Tikieta's friends later arrived at the house and gave her and [the petitioner] a ride to a car dealership where Tikieta purchased a car. Tikieta and [the petitioner] returned to her house, and she showed the new car to her family. [The petitioner] played basketball by himself on the patio at the rear of the house. The family eventually went inside the house and sat in the living room together to socialize. From inside the house, a large window looked out to the patio where [the petitioner] continued to play basketball.

As was his daily custom, the victim arrived at the house around 8 p.m. to drop off his and Tikieta's fifteen-year-old son, Dierre Williams. The victim parked his car in the driveway at the side of the house, and he remained there while Dierre went in the back door of the house, which was located close to the basketball goal where [the petitioner] was playing. Once inside, Dierre asked if anyone could provide the victim with change for a $100 bill. No one responded that they could, and Tikieta told Dierre to ask the victim in. The victim came in through the back door, and Tikieta informed him of a meeting they had to attend the next morning. After two

---

[1] Because many of the witnesses share the same surname, we refer to them by their first names for clarity. We mean no disrespect.

to three minutes, the victim exited the back door. Within one to two minutes of the victim's exit, Bridgette Carmichael, one of Tikieta's daughters, realized she had change and called the victim back in the house. The victim returned inside the house, exchanged money with Ms. Carmichael, and again went to the back door. As the victim began to step out the door, [the petitioner] attacked the victim, grabbing the victim by wrapping his arms around the victim's midsection and pushing him into the house. When [the petitioner] did this, he said to the victim, "I told you not to come back here." As the two men were "tussling," it appeared as though [the petitioner] was punching the victim. [The petitioner] had pushed the victim against a wall such that the victim was unable to fight back. In a matter of seconds, everyone in the house ran to separate them. Once free of [the petitioner], the victim picked up a small end table that was nearby as though to throw it at [the petitioner]. Instead, the victim looked at the children in the room and then set the table down. The victim walked out the door and to his car, and several children followed him. [The petitioner] remained inside. One of the children soon returned and said that [the petitioner] had stabbed the victim. Tikieta went outside to the victim's car and saw him face down in the passenger seat. He was breathing but unresponsive, and Tikieta and others called 911 for help. [The petitioner] left the house on foot when Tikieta went to the victim's car.

Tikieta testified that the victim did not have a weapon at the time of the fight. [The petitioner], however, had a pocket knife that he would always carry with him. She was not aware of any words being exchanged between the victim and [the petitioner] while the victim was at the house, and the victim did not say anything to [the petitioner] during the fight. The victim also was not arguing with anyone else at the house.

Approximately one and a half years before this incident, [the petitioner] and the victim had a verbal altercation. At a barbecue at Tikieta's house, the two men "passed words" after the victim gave Tikieta some money, but the altercation did not become physical. She did not see or hear how the argument between the men started, but she recalled telling the victim to leave the barbecue. Tikieta testified that they did not have any further altercations before the day of the victim's death.

Tikieta reviewed a number of photographs, admitted as exhibits at trial, that depicted the interior and exterior of her house and the relative locations of the patio, the basketball goal, the back door, the area where the fight occurred, and the victim's car.

3

On cross-examination, Tikieta acknowledged that she previously testified that [the petitioner] had lived at her house as recently as two months before the homicide. She maintained, however, that it had been longer than two months. She conceded that she previously testified that the altercation between the victim and [the petitioner] occurred seven months before the homicide. Tikieta further acknowledged that she may have told the police that the victim threw the table, but she maintained at trial that the victim did not do so.

When [the petitioner] attacked the victim, Tikieta was sitting on a couch and could see the back door. She was unsure how many times she saw [the petitioner] punch the victim, and she did not realize that the victim had been stabbed until after the fight. Tikieta identified a floor plan of the house, which was admitted as an exhibit.

Bridgette Carmichael, Tikieta's daughter, testified that although she was not biologically related to the victim, she knew him as a father. She, along with her son and fiancé, lived at Tikieta's Rosemont residence for approximately six to eight months until they moved out one month before the homicide. [The petitioner] did not live at the residence during the time Ms. Carmichael lived there, but he would sometimes visit. She testified that she was not "comfortable" with [the petitioner] and that she would not have lived there with him.

On February 11, 2009, Ms. Carmichael arrived at Tikieta's house with her son and fiancé at approximately 3:30 p.m. No one else was at the home until Tikieta arrived with [the petitioner] at approximately 5 p.m. She was surprised to see [the petitioner] there, and she had not seen him since she moved out of the house a month earlier. Ms. Carmichael's trial testimony of the attack on the victim was consistent with that of Tikieta. She further observed that [the petitioner] made a punching motion more than once. As the family separated [the petitioner] and the victim, [the petitioner] cut Dierre's hand. Ms. Carmichael did not see a knife, but she testified that [the petitioner] "always had little pocket knives." [The petitioner] and the victim did not speak to each other before the fight.

On cross-examination, Ms. Carmichael testified that the previous altercation between [the petitioner] and the victim occurred while [the petitioner] lived at Tikieta's house, approximately six months before the victim's death.

4

Mya Williams, one of Tikieta's daughters, testified that the victim had been like a father to her all her life and that she would see him on a daily basis. On the evening of the date in question, Mya was inside with her family when the victim called Tikieta to tell her he would be there at around 7:30 or 8 p.m. When the victim and Dierre arrived, Mya went outside to the victim's car. [The petitioner] was outside playing basketball at the time. Dierre went inside, and Mya stayed outside with the victim. Dierre soon returned, and the victim and Dierre went inside the house. Mya remained outside, and she did not hear the victim and [the petitioner] speak to each other. She soon heard screaming, and she ran to the house, where she saw everyone grabbing [the petitioner]. [The petitioner] had a "medium-sized little pocket knife," and "he was getting ready to fold it back up and put it in his sleeve." [The petitioner] said, "I told you I was going to get that nigga." The victim walked out the door, and Mya followed him to his car. The victim got in his car and reached to start it, but his arm fell back down to his side. Dierre and Mya asked the victim what was wrong, and the victim said, "I'm hit." Mya opened the victim's shirt and realized that he had been stabbed. Dierre moved the victim to the passenger side of the car and tried to start the car to take the victim to the hospital. Mya prevented Dierre from leaving and convinced him to wait for an ambulance.

Mya testified that the victim was approximately two inches taller than [the petitioner], and he outweighed [the petitioner] due to his "belly." [The petitioner] was younger than the victim.

On cross-examination, Mya testified that the victim still cared for Tikieta. She had never seen [the petitioner] and the victim argue before.

Tommie Braddox testified that he lived at 760 Rosemont, next door to Tikieta's house. He was at Tikieta's house visiting with the family at the time of the victim's death. His account was substantially similar to that of the previous trial witnesses. He testified that as the victim was leaving the house after exchanging money with Ms. Carmichael, [the petitioner] "ambushed" him. Mr. Braddox saw [the petitioner] punch the victim, and he did not see anything in [the petitioner's] hand. [The petitioner] and the victim had not been arguing before the fight began.

On cross-examination, Mr. Braddox testified that the victim only came in the house one time. He testified that [the petitioner] had lived at

5

Tikieta's house but that he had not lived there recently before the date in question. The previous argument between the victim and [the petitioner] occurred in the summer of 2008.

Jarvis Williams testified that he lived at 760 Rosemont next door to Tikieta's house. He was at Tikieta's house all afternoon and evening on the date in question. He testified that [the petitioner] was inside the house until Dierre arrived. At that time, [the petitioner] went to the back yard to play basketball. In all other respects, Jarvis's direct testimony was consistent with that of the other witnesses. He testified on cross-examination that [the petitioner] lived at the house at the time of the victim's death and that he had lived there since Tikieta moved there.

Officer Lee Potts of the Memphis Police Department testified that when he arrived at the scene on the date in question, he saw a black male in a car parked in the driveway. The man was face down in the passenger seat, and he was unresponsive and not breathing. Officer Potts, who was previously an emergency medical technician with the Memphis Fire Department and a licensed nurse, determined that the victim was dead. He called for an ambulance, directed his partner to secure the scene, and went inside the house to learn what had happened.

Dr. Marco Ross of the Shelby County Medical Examiner's Office testified that he performed an autopsy on the victim.[2] He found three recent wounds on the victim's body: an abrasion on the right side of the back, a small scrape on the right side of the chin, and a stab wound on the abdomen below and to the left of the belly button. The stab wound was three-fourths of an inch long and four to five inches deep. The wound penetrated the abdominal cavity, perforated the small intestine and the mesentery, and cut the left common iliac artery. Dr. Ross found approximately two quarts of blood in the abdomen as a result of the stab wound. He observed that both ends of the wound on the skin had a "squared-off appearance," and he concluded that a knife blade had been inserted to the depth of the knife handle. He explained, "Most knife blades, either single[-] or double-edged blades, will usually terminate into, but the sharp part disappears and becomes just a blunt part of blade just before it enters the handle area . . . ." He estimated that the blade would have been three to six inches long. The wound was consistent with one that a pocket knife might cause in a single

---

[2] Because Dr. Ross was unavailable at trial, a video recording of his deposition testimony was played for the jury.

thrust. It was inconsistent with multiple thrusts of a knife. A toxicology test revealed that marijuana was present in the victim's body. Based on Dr. Ross's observations, he determined that the victim's cause of death was a stab wound to the abdomen and that the manner of death was homicide. A copy of Dr. Ross's autopsy report and several photographs depicting the victim's wounds were admitted as exhibits at trial.

On cross-examination, Dr. Ross testified that he observed no evidence that the knife was twisted in the victim, and the stab wound penetrated from front to back and slightly upward. According to Dr. Ross, it would be uncommon for a single stab wound to the lower abdomen to cause death. Although he was unable to draw any conclusions regarding the cause of the other wounds, Dr. Ross opined that they were not defensive wounds. The toxicology report indicated that the victim had likely ingested marijuana within the last twenty-four hours, but Dr. Ross could not more specifically limit the time frame of ingestion.

Lakeydra Brown, [the petitioner's] sister, testified for the defense that in 2006, she lived at 773 Rosemont. [The petitioner] and Tikieta lived there with Lakeydra and her husband, Marcus Brown, for approximately one and a half months. [The petitioner] and Tikieta moved out when Tikieta bought the house across the street. Lakeydra was aware that [the petitioner] and the victim had an argument approximately three or four months before September 2008, when the Browns moved from their house on Rosemont. After the argument, [the petitioner] would avoid contact with the victim. When the victim would go to Tikieta's house, [the petitioner] would go to the Browns' house. On cross-examination, Lakeydra testified that the victim continued to go to Tikieta's house after the argument with [the petitioner] and that he was not prohibited from doing so.

Marcus Brown also testified for the defense, and he provided substantially the same testimony as Lakeydra. He added that the reason [the petitioner] would go to the Browns' house when the victim was at Tikieta's house was to allow Dierre and the victim time together.

*State v. Frederick Greene*, No. W2011-01180-CCA-R3-CD, slip op. at 1-6 (Tenn. Crim. App. June 27, 2012). The petitioner was convicted of first degree (premeditated) murder, and he filed a timely petition for post-conviction relief.

At the post-conviction hearing, trial counsel testified that he had been practicing law since 1998. He stated that he had tried seventy-five cases in his career, at least forty

7

of which were murder cases. Trial counsel testified that he did not believe that the jury would find that the petitioner had acted in self-defense but that there was a possibility of obtaining a conviction for manslaughter if the defense could establish the nature of the prior relationship between the victim and Ms. Williams and the relationship between Ms. Williams and the petitioner. Trial counsel explained that the problem with this theory was that "the [S]tate's witnesses didn't cooperate with that line in many instances." He testified that the petitioner was aware of this trial strategy. Trial counsel agreed that he was aware that the State's theory of the case was going to be that the petitioner "pretty much ambushed" the victim as he was walking out of the door.

Trial counsel testified that he never told the petitioner "to testify or not to testify." He stated that the decision of whether to testify belonged to the petitioner. Trial counsel explained that from the outset of his representation of the petitioner, the petitioner informed his defense team "that he did not want to testify unless he absolutely had to -- unless everything went so bad . . . that [trial counsel] felt like [the petitioner] had to testify." Trial counsel stated that the petitioner did not "want to testify, period. That was -- regardless of whether or not there were priors entered or not, he did not want to get on the witness stand." Trial counsel testified that the issue of whether the petitioner should testify was raised "in a round-about way" in each of his meetings with the petitioner. Trial counsel said that the primary goal of these meetings was to craft a strategy to place the petitioner's versions of events in front of the jury, and one such strategy would have been to call the petitioner as a witness. Trial counsel further stated that this method was a "fall back" because the petitioner did not want to testify. Trial counsel recalled that the petitioner's declaration that he did not want to testify "was early and consistent and never waned."

Trial counsel testified that he discussed the advantages and disadvantages of testifying with the petitioner "dozens of times." He informed the petitioner that an argument in favor of testifying was that the petitioner's account of the events had remained consistent. It was also an advantage that the petitioner had not confessed to a crime in his statement to police. Trial counsel testified that there were several disadvantages to testifying, including the minimal believability of the petitioner's assertion that Ms. Williams and her son held the petitioner down so that the victim could beat up the petitioner in the petitioner's own home. Trial counsel also testified that a disadvantage was the fact that the petitioner's version "was completely inconsistent with what everyone else testified to and [what] was in the discovery." Trial counsel testified that the petitioner's three prior convictions for violent felonies and their admission for impeachment purposes would have been another disadvantage to the petitioner's testifying. He stated that he made it clear to the petitioner that the decision to testify belonged to the petitioner.

Trial counsel testified that at the conclusion of the defense's proof, he discussed the advantages and disadvantages of testifying with the petitioner. He said that the petitioner "made the ultimate decision" not to testify. Trial counsel testified that he could not recall whether he specifically gave an opinion to the petitioner about whether he should testify. He stated that if he did make a recommendation that the petitioner should not testify, it would have come at the conclusion of the defense's proof, and "it would have been a lean," possibly "even a strong lean," toward the petitioner's not testifying. Trial counsel said that the basis of this recommendation would have been his belief that the petitioner's prior convictions would have been admitted and his concern that the petitioner "could open the door to the facts of the convictions[,] which were really bad."

The petitioner had multiple prior convictions, which included two aggravated assault convictions and an attempted second degree murder conviction. Trial counsel testified that he discussed the petitioner's prior convictions with him. He informed the petitioner that he was aware of the facts of the allegations and that it would be harmful to the petitioner's case if these facts were revealed to the jury. Trial counsel told the petitioner that he believed it was likely that his prior violent felony convictions would be admissible for impeachment purposes. He also told the petitioner that the State could not question him about the facts underlying the conviction unless the petitioner "opened the door to it." Trial counsel "explained, in extreme detail," what "opening the door" meant. Trial counsel testified that he made it "exhaustive[ly]" clear to the petitioner that the State could not ask him about the underlying facts of his prior convictions if he testified. Trial counsel testified that he did not believe that he would ever tell the petitioner that he should not testify or attempt to force him not to testify.

Trial counsel testified that he did not discuss a self-defense instruction with the petitioner, but he informed the petitioner that he was going to raise self-defense as a theory. Trial counsel agreed that he did not tell the petitioner that he was not likely to receive a self-defense instruction unless he testified or that the petitioner needed to testify in order to receive a self-defense instruction. Trial counsel also testified that he did not tell the petitioner that he would need to testify in order to be convicted of a lesser included offense. Trial counsel testified that he informed the petitioner that convincing a jury of the truth of the petitioner's version of events was "going to be a hard sell especially if the witnesses [were] consistent with what their statements were to police."

Trial counsel testified that his primary defense strategy was to argue for a conviction for voluntary manslaughter. Trial counsel explained that his "whole theory" of the case was that tensions existed between the victim and the petitioner because the petitioner was in a romantic relationship and living with the victim's ex-girlfriend. He explained that it was problematic to prove this theory because the State's witnesses denied that the petitioner was in a romantic relationship with Ms. Williams. He stated

9

that the testimony of the petitioner's sister and brother-in-law got him "eighty percent of the way" toward establishing the existence of a romantic relationship between Ms. Williams and the petitioner. Their testimony failed to fully establish the relationship because they were not at the residence on a daily basis. Self-defense was a secondary defense theory, and trial counsel testified that he believed that the proof was sufficient to raise the issue of self-defense. He stated that that he "absolutely" believed he was going to receive a self-defense instruction. He testified that the focus of the defense "was to establish friction and hope for manslaughter after that testimony." Based upon this belief, he did not believe that it was "worth the risk" to call the petitioner as a witness. Trial counsel testified that he did not make a motion to reopen the proof after the trial court denied his request for a self-defense instruction. He testified that he did not tell the petitioner that he needed to testify in order to receive a self-defense instruction.

Trial counsel testified that he told the petitioner that he was entitled to a hearing regarding the admissibility of his prior convictions pursuant to Tennessee Rule of Evidence 609 and *State v. Morgan*, 541 S.W.2d 385 (Tenn. 1976). Trial counsel informed the petitioner that the hearing would likely result in the admission of his felony convictions "for credibility purposes only." Trial counsel explained that he had tried "probably ten murder trials in this division" that had 609 hearings and that he knew "what gets admitted and what doesn't."

Trial counsel testified that he was unsure whether he filed a Rule 609 motion, but he recalled that he did not ask for a Rule 609 hearing. He testified that the only reasons he could think of for not filing the motion were the petitioner's insistence that he did not want to testify and trial counsel's belief that "it was a virtual certainty that at least one, but probably all of those violent felony convictions would be admitted . . . to impeach him for credibility." Trial counsel felt that the admission of the prior convictions would ensure that the petitioner was convicted.

Trial counsel testified that it was "inexplicable" that he did not request a Rule 609 hearing. He did not remember specifically writing on a piece of paper at the motion for new trial hearing that he was "going to have to take the blame for" the failure to have a 609 hearing. However, he testified that he could see himself "telling [the petitioner] that" he should have requested the hearing. Trial counsel testified that he "[a]bsolutely" wished that he had requested a 609 hearing.

Trial counsel was presented with several hypothetical scenarios regarding the outcome of a 609 hearing. Trial counsel stated that if the trial court ruled that the petitioner's violent felony convictions were inadmissible, "it might have changed" his advice to the petitioner regarding his decision to testify. He testified that the exclusion of

only the attempted murder conviction would not have affected his advice to the petitioner.

Trial counsel testified that he was aware that Ms. Williams had prior convictions for theft. He testified that he believed the convictions possessed minimal value as impeachment evidence and that an attempt to use them to impeach Ms. Williams would not "have been well received by the jury." Trial counsel believed the attempt at impeachment could have appeared "distasteful to the jury." Trial counsel made "a conscious decision" not to impeach Ms. Williams with the convictions. He agreed that he attempted to use cross-examination to highlight inconsistencies in Ms. Williams's testimony and to impeach her credibility as a witness.

Trial counsel testified that he did not question Ms. Williams about her involvement in a scheme to prepare fraudulent tax returns because it bore very little relevance to her credibility. Ms. Williams was very emotional on the witness stand, and trial counsel believed that any attempt to impeach her would have been "pretty distasteful" to the jury. For that same reason, trial counsel did not question her about an incident at her former place of employment where she would give family members free merchandise. Similarly, he did not question her about bringing false documents to purchase a car on the day of the stabbing.

Trial counsel testified that he was not aware that Tommie Braddox[3] was charged with theft of property or for driving on a suspended license prior to the trial. He testified that he did not believe that the trial court would have permitted cross-examination into these issues.

Trial counsel testified that he did not think it was necessary to request a mistrial after Ms. Carmichael testified that she was not comfortable around the petitioner. Trial counsel did not believe that her testimony "rose to the level of asking for a mistrial," and he was not certain that her testimony was even improper. Trial counsel stated that her response put him "on notice to be careful about the kinds of questions that we asked her."

Trial counsel was asked about the State's closing argument. During rebuttal closing argument, the prosecutor stated, "What's really happening here, ladies and gentlemen, is that there is no defense to this case. That's why all you heard about was some type of minor inconsistencies." Trial counsel testified that he did not believe the

---

[3] At the post-conviction hearing, the transcript reflects that Mr. Braddox's name was spelled "Tommy Braddock." On direct appeal, his name was spelled "Tommie Braddox," and we utilize that spelling in this opinion.

11

prosecutor commented on the petitioner's decision not to testify during closing argument. As a result, he did not object to the comment or ask for a mistrial.

Co-counsel testified that he was second chair in this case. Trial counsel was responsible for the guilt/innocence phase of the trial, and co-counsel was responsible for the mitigation phase. He stated that he met with the petitioner "plenty of times" prior to trial both individually and with trial counsel. Co-counsel stated that based upon conversations with the petitioner and available discovery materials, the defense's strategy was to attempt to establish arguments for self-defense and manslaughter.

Co-counsel testified that the primary defense was manslaughter and that a "[b]ackup" defense was self-defense. Co-counsel explained that one of the problems with a self-defense argument was that crime scene photographs showed that the living room was not in disarray as the petitioner claimed. Co-counsel believed that the available evidence at the time of trial gave rise to "a colorable argument" for self-defense, and co-counsel hoped that the trial court would grant an instruction for self-defense.

Co-counsel recalled that when he joined the case, the petitioner informed him that he was not going to testify. Co-counsel testified that the petitioner's intention "never changed." Co-counsel believed that he likely had a conversation with the petitioner about the advantages and disadvantages of testifying. Co-counsel thought that if the petitioner attempted to testify regarding self-defense that his prior assault convictions would have been admissible. Through his interviews with family members, co-counsel learned that the petitioner sometimes had a "hair-trigger temper," and co-counsel discussed this reputation with the petitioner. Co-counsel believed that the petitioner could cause serious damage to his case if he were to testify and get upset during cross-examination.

Co-counsel testified that trial counsel primarily "would take the lead" in discussing the admissibility of the petitioner's prior convictions. Co-counsel believed that either he or trial counsel explained to the petitioner that the proof would have to raise self-defense in order for the petitioner to receive the instruction. Co-counsel did not tell the petitioner that he needed to testify in order to receive the self-defense instruction or that the petitioner "was good to go on self-defense" based solely on the State's proof.

Co-counsel testified that he discussed with the petitioner whether he should testify. Co-counsel informed the petitioner that it was his choice and that in co-counsel's professional opinion, the petitioner "probably should not testify." Co-counsel stated that the primary reason for this advice was the fact that the petitioner did not want to testify. He also stated that he believed the petitioner's prior convictions would be admissible and that the petitioner would more likely harm than benefit his case if he testified. He stated

that a disadvantage of the petitioner's testifying was the risk that the State could address the facts of his convictions on cross-examination and cause him to get upset during cross-examination. Co-counsel stated that he and trial counsel told the petitioner that they believed the trial court would likely admit the petitioner's prior convictions if he testified. Co-counsel testified that he told the petitioner that the decision to testify "ultimately" belonged to the petitioner.

Co-counsel stated that he likely advised the petitioner at the conclusion of the proof that it was his decision whether or not to testify. Co-counsel testified that he "more or less" told the petitioner that he "probably should not testify." Co-counsel testified that "at the end of trial, the proof came out better than we hoped." Co-counsel believed that the defense "had a very, very strong case for manslaughter." He informed the petitioner that the trial court would conduct a hearing to determine the admissibility of his prior convictions, and co-counsel expressed his belief to the petitioner that the convictions would be admissible. Co-counsel also told the petitioner that the defense could argue self-defense. After receiving this advice, the petitioner announced that he did not want to testify.

Co-counsel explained that the defense did not ask for a Rule 609 hearing because both trial counsel and co-counsel believed that the petitioner did not wish to testify and "never once indicated any desire to testify." He stated that the petitioner was aware that if he did choose to testify, the court would hold a hearing to determine if his convictions were admissible. Co-counsel stated that he never told the petitioner that his prior convictions were "definitely coming in." Co-counsel discussed the petitioner's prior convictions with him, and he told the petitioner that the underlying facts of the convictions would be inadmissible if he testified.

The petitioner testified next, and he conveyed his version of the events that resulted in the victim's death. On the evening of the incident, he was at Ms. Williams's house playing basketball in the backyard. He saw the victim arrive at the house, and he continued to play basketball. Once he believed the victim had left the residence, the petitioner went inside. The petitioner was attempting to walk toward the bedroom in the house when the victim blocked his path. The victim told the petitioner, "N*****, I'll kill you," and he grabbed the petitioner in the chest and "rammed" him against a bookshelf. The two began to fight, and Ms. Williams and the victim's son grabbed the petitioner's arms, restraining him and pulling him across the room. While the petitioner was restrained, the victim's son began punching him in the face. The petitioner saw the victim pick up an end table, and the victim swung it at him. The petitioner raised his arm to block the blow, and the table struck him on the elbow. The table fell to the ground, and the petitioner reached into his pocket for a small switchblade knife. He released the blade as the victim attempted to attack him a second time. The victim came forward to

punch the petitioner, and the petitioner "kind of met" the victim with the blade, stabbing him one time in the stomach. The petitioner dropped the knife and ran out of the residence.

The petitioner also testified about a confrontation he had with the victim at a cookout in 2008. The victim appeared at the cookout and was demanding money from Ms. Williams. Ms. Williams replied that she did not owe the victim anything and that he owed her money for child support. The victim then "blurted out," "MF, you and your weak-ass boyfriend," apparently directing the insult toward Ms. Williams and the petitioner. The petitioner asked what he had to do with the argument between Ms. Williams and the victim, and the victim "kind of like charged toward" him. Family members then intervened and broke up the altercation.

The petitioner testified that he would have given the jury the same account of both events if he testified.

The petitioner testified that trial counsel met with him "maybe eight times" prior to trial. The petitioner testified that trial counsel explained to him that they "had a powerful case" and would attempt to argue self-defense. The petitioner stated that he told trial counsel that he had wanted "to testify since the start." The petitioner believed that he expressed his desire to testify to trial counsel "maybe about four times." He stated that trial counsel would always tell him, "We'll worry about that later." He testified that trial counsel told him that it was "a good self-defense case" and that he planned to argue "self-defense; but, at the least, manslaughter." The petitioner felt as though his testimony "was the best thing" for his case. He asked counsel for their opinion regarding his testimony, and he testified that both counsel told him that they did not believe he should testify. He stated that counsel told him that they were going to be able to present the defenses of voluntary manslaughter and self-defense based solely on the State's proof.

The petitioner testified that he discussed his prior convictions with trial counsel. He stated that trial counsel told him that he should not testify because of his prior criminal record. The petitioner believed that the underlying facts of his convictions would be admissible because trial counsel never specifically informed him that the details were inadmissible. When he discussed his prior convictions, trial counsel would read the facts and state that he did not want the jury to hear that information. The petitioner took this statement to mean that the facts would be admissible. He agreed that trial counsel did not tell him that the details would be admitted. The petitioner stated that he would have testified if he had been aware that the underlying facts would not be admitted.

14

The petitioner testified that he would have taken the stand if trial counsel told him that he thought the petitioner should testify. The petitioner explained that trial counsel told him that he had a good case for self-defense, even without his testimony. He stated that trial counsel never told him that he needed to testify in order to guarantee that the jury was instructed regarding self-defense. He said that he would have testified if trial counsel had informed him that he needed to testify to receive a self-defense instruction. The petitioner believed that trial counsel would be able to argue self-defense without the petitioner's testimony.

The petitioner said that trial counsel informed the petitioner that the State's proof against him was "ugly" and that the trial would not be easy. However, the petitioner stated that trial counsel informed him that there was enough evidence to attack the State's case and that trial counsel advised him not to testify. The petitioner agreed that he understood that it was his decision whether he should testify. He testified that he made his decision not to testify based upon the advice of counsel, who convinced him that "things were looking bright" at the conclusion of the State's proof. The petitioner asked for trial counsel's opinion of the case, and trial counsel told him that "[t]hings are good" and that the defense had "a good case." The petitioner stated that trial counsel told him that his advice was not to testify but that the petitioner could testify if he wanted to. The petitioner agreed that he never, "at any time," informed trial counsel that he did not want to testify. The petitioner testified that trial counsel's statement that his prior convictions would be admitted heavily influenced his decision not to testify.

The petitioner agreed that both counsel explained that they intended to pursue the defenses of a conviction of a lesser included offense and self-defense. He testified that counsel said that the testimony of the medical examiner and the fact that he lived at Ms. Williams's residence constituted "good proof" in his case. He stated that he recounted his version of the stabbing to trial counsel and that trial counsel replied, "I don't think the jury is going to believe that." Trial counsel informed him that based upon his prior convictions, the State could attempt to make him "sound bad," to "stumble on [his] words," and "to contradict" him during cross-examination. He said that trial counsel never told him that he needed to testify in order to receive a self-defense instruction. He would have testified if he had been so told. Based upon his conversations with trial counsel, the petitioner believed that trial counsel would be able to argue self-defense without his testimony. He testified that trial counsel did not tell him that he may need to reconsider his decision not to testify after the trial court denied the request for a self-defense instruction.

The petitioner testified that he understood that it was his decision whether to testify. He stated that he made his decision not to testify based upon the advice of counsel.

15

The petitioner stated that trial counsel never informed him that he had a right to a 609 hearing. The petitioner testified that he brought up a *Morgan* hearing with trial counsel after researching the issue and that trial counsel informed him that the hearing was optional. He testified that *Morgan* only was discussed "in the beginning stages" of his case and that the issue was not discussed during trial. He said that trial counsel informed him that the hearing was optional but told the petitioner not to worry about it and "kind of brushed the topic back." Trial counsel did not inform him that he could argue at a *Morgan* hearing that his convictions were inadmissible. He testified that if he had this knowledge, he would have "immediately" requested the hearing. Trial counsel informed the petitioner that he believed that all of his convictions would come in if the petitioner testified. The petitioner testified that if his prior violent felony convictions had been excluded, he would have testified.

The petitioner testified that at his motion for new trial hearing, trial counsel told him that he "felt bad" and that he wrote on a notepad, "I got to take the blame for this. . . . On post conviction, no *Morgan* hearing. . . . I should have done it." He felt that trial counsel should have requested a *Morgan* hearing. He felt that trial counsel could have done "a better job with the closing argument - impeaching the state's witnesses concerning the prior convictions. Not showing sympathy." He felt that trial counsel could have been more "aggressive" in representing the petitioner.

The petitioner stated that he met with co-counsel "four to five times" in jail prior to his trial. He stated that co-counsel echoed trial counsel's recommendations on strategy. He testified that co-counsel informed him that the decision of whether to testify was left to the petitioner and trial counsel. He stated that co-counsel never discussed the pros and cons of testifying, a *Morgan* hearing, the admissibility of his prior convictions, or a self-defense instruction. Co-counsel never told the petitioner that he needed to testify in order to get a self-defense instruction. The petitioner did not discuss the underlying facts of his convictions with co-counsel.

The petitioner testified that he informed trial counsel about Ms. Williams's prior dishonest acts. He informed trial counsel that Ms. Williams and her mother had participated in "preparing bogus income tax" returns and that Ms. Williams had prior convictions for theft. He also informed trial counsel why Ms. Williams was fired from her previous place of employment. He told trial counsel about Ms. Williams's using fake check stubs to purchase a new car on the day of the stabbing.

The petitioner testified that he would "get very personal" with trial counsel when discussing the case and informed trial counsel that he wanted his "side of the story to be

told" and that he needed "to say something" after seeing that "everybody was against" him.

On cross-examination, the petitioner testified that he did not have a hair-trigger temper or get upset easily. He agreed that he never expressed to the trial court a desire to testify. He agreed that he understood that he could open the door to the underlying facts of his prior convictions by his testimony at trial. The petitioner testified that he "felt good" at the conclusion of his proof.

In its oral findings, the post-conviction court first addressed the petitioner's arguments regarding the 609 hearing. The court stated that it would not determine whether it would have admitted the convictions but would limit its findings to whether it was ineffective for trial counsel to fail to request the hearing. The post-conviction court credited the testimony of counsel that the petitioner did not wish to testify and found that his desire not to testify provided counsel with "a rational and reasonable explanation" and "a valid reason" for not requesting the 609 hearing. The court found that the petitioner's specific indication that he did not wish to testify provided "a rational reason" as to why trial counsel did not request a 609 hearing.

The court implicitly credited trial counsel's testimony that their best strategy at trial was to attempt to obtain a conviction for the lesser included offense of manslaughter based on the proof at trial. The court noted that often times, a defendant needed to testify in order to receive a self-defense instruction. The court observed that there was an "indication" that the petitioner could harm his case if he testified based upon his demeanor during the post-conviction hearing. The court found that in light of the petitioner's demeanor on the witness stand, the risk of opening the door to the facts of his convictions by testifying that the victim was the first aggressor, and the fact that he was facing the death penalty, that it would have been "a piece of very dangerous advice" to urge the defendant to testify.

The court found that the petitioner "made a valid decision not to testify" and that counsel "had fully advised [the petitioner] of what would and could happen if he did testify." The court found that counsel had provided the petitioner with their opinion as to whether he should testify but that counsel permitted the petitioner "to make that ultimate decision." The court found that trial counsel was not ineffective "for not trying to talk him into getting on the witness stand and testifying." The court implicitly credited the testimony of counsel that they believed the proof was sufficient to warrant a self-defense instruction. The court noted that it did not believe it would have permitted the defense to reopen the proof and call the petitioner to testify after denying the request for a self-defense instruction. The court found that even if it had given the requested instruction, it did not appear likely that the jury would have acquitted the petitioner.

17

The post-conviction court found that trial counsel made a strategic decision not to cross-examine Ms. Williams about her prior convictions and that trial counsel provided a "logical" explanation for his decision. The court found that impeaching Ms. Williams would not have affected the outcome of the trial, because other witnesses corroborated Ms. Williams's testimony and the impeachment would not have gained the defense any real advantage at trial. The court found that the petitioner had failed to demonstrate that he was prejudiced by trial counsel's decision.

The post-conviction court made a similar finding in regards to Mr. Braddox. The court noted that it was "not even sure that it would have been proper to attempt to impeach Mr. [Braddox] on that driving charge." The court found that trial counsel made a strategic decision not to impeach Mr. Braddox and that the petitioner had not demonstrated any prejudice stemming from this decision.

The post-conviction court found that trial counsel was not ineffective for failing to ask for a mistrial after Ms. Carmichael's testimony. The court observed that it did not "see any basis for granting a mistrial if one had been requested." The court found that the petitioner again failed to demonstrate that he was prejudiced by trial counsel's decision.

The court found that the State's closing argument was not a comment on the petitioner's decision not to testify. The court found that the comments were in reference to the closing argument of the defense that the proof demonstrated that a finding of self-defense or a conviction of a lesser included offense was proper. The court stated that it did not believe that the jury interpreted the argument as a comment on the petitioner's decision not to testify. The court found that the argument was "more a comment on the fact that there is no defense in this case based upon the facts."

After issuing its findings, the post-conviction court orally denied the petition for post-conviction relief. The court later issued a written order denying the petition. The petitioner filed a timely notice of appeal, and we now proceed to consider his claims.

## ANALYSIS

On appeal, the petitioner raises several claims of ineffective assistance of counsel. He contends that counsel were ineffective for failing to inform the petitioner that the underlying facts of his convictions would be admissible if he testified and for failing to request a 609 hearing; advising the petitioner not to testify and for failing to advise him that he needed to testify in order to receive a self-defense instruction or to be convicted of a lesser included offense; failing to impeach Ms. Williams and Mr. Braddox with their prior bad acts; failing to request a mistrial after the testimony of Ms. Carmichael; and

18

failing to request a mistrial or object during the State's closing argument. He also contends that the cumulative effect of counsel's errors warrants post-conviction relief. The State responds that the petitioner received the effective assistance of counsel.

Post-conviction relief is available "when the conviction or sentence is void or voidable because of the abridgment of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." T.C.A. § 40-30-103 (2010). The petitioner bears the burden of proving the allegations of fact giving rise to the claim by clear and convincing evidence. *Dellinger v. State*, 279 S.W.3d 282, 293 (Tenn. 2009). "'Evidence is clear and convincing when there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence.'" *Grindstaff v. State*, 297 S.W.3d 208, 216 (Tenn. 2009) (quoting *Hicks v. State*, 983 S.W.2d 240, 245 (Tenn. Crim. App. 1998)). This court generally defers "to a post-conviction court's findings with respect to witness credibility, the weight and value of witness testimony, and the resolution of factual issues presented by the evidence." *Mobley v. State*, 397 S.W.3d 70, 80 (Tenn. 2013). Claims for post-conviction relief premised on ineffective assistance of counsel present mixed questions of law and fact, which this court reviews de novo with no presumption of correctness. *Id.*

Both the Sixth Amendment to the United States Constitution and article I, section 9 of the Tennessee Constitution guarantee the right to counsel. This right affords an individual representation that is "within the range of competence demanded of attorneys in criminal cases." *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975). Counsel is ineffective when "counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland v. Washington*, 466 U.S. 668, 686 (1984).

In order to prevail on a claim of ineffective assistance of counsel, the petitioner must prove by clear and convincing evidence that: (1) counsel's performance was deficient; and (2) the deficiency prejudiced the petitioner to the degree that the petitioner did not receive a fair trial. *Strickland*, 466 U.S. at 687. A petitioner satisfies the deficiency prong of the test by showing that counsel's representation fell below an objective standard of reasonableness; that is, "the services rendered or the advice given must have been below 'the range of competence demanded of attorneys in criminal cases.'" *Grindstaff*, 297 S.W.3d at 216 (quoting *Baxter*, 523 S.W.2d at 936); *see Strickland*, 466 U.S. at 687. The petitioner must demonstrate that "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland*, 466 U.S. at 687. Courts evaluating the performance of an attorney "should indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *State v. Burns*, 6 S.W.3d 453, 462 (Tenn. 1999). In order to fairly assess counsel's conduct, every effort must be made "to

eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Strickland*, 466 U.S. at 689. "The fact that a particular strategy or tactic failed or hurt the defense, does not, standing alone, establish unreasonable representation." *Goad v. State*, 938 S.W.2d 363, 369 (Tenn. 1996).

Prejudice requires the petitioner to show "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* If the petitioner fails to establish either deficiency or prejudice, post-conviction relief is not appropriate, and this court need not address both components if the petitioner makes an insufficient showing as to one component. *Grindstaff*, 297 S.W.3d at 216 (citing *Goad*, 938 S.W.2d at 370).

## I. Rule 609 Hearing

The petitioner argues that trial counsel was ineffective for failing to inform him that the underlying facts of his prior convictions would be inadmissible if he testified. In the post-conviction hearing and in his brief, the petitioner maintained that even if all of his prior convictions were admissible, he would have testified had trial counsel informed him that the underlying facts of the convictions would be inadmissible. This claim is contradicted by the testimony at the hearing. Trial counsel stated that he made it "exhaustive[ly]" clear to the petitioner that the State could not question him about the underlying facts of his convictions if he chose to testify. Co-counsel also testified that he informed the petitioner that the underlying facts of his convictions would not be admissible if the petitioner testified. The post-conviction court credited the testimony of counsel that they informed the petitioner of the consequences of his testimony. The petitioner has failed to establish that trial counsel performed deficiently in this regard.

The petitioner also argues that trial counsel was ineffective for failing to request a Rule 609 hearing. He contends that the record preponderates against the post-conviction court's findings of fact that he expressed a desire not to testify. He next claims that the failure to have a hearing was deficient performance because it deprived him of the ability to make a truly knowing and voluntary decision not to testify. He also argues that the failure to request a hearing affected the outcome of the case. He contends that the trial court would have ruled the petitioner's prior violent felony convictions inadmissible for impeachment purposes, which would have caused him to testify at trial and ultimately led to his acquittal or a conviction of a lesser included offense.

In regards to the 609 hearing, trial counsel testified that it was "inexplicable" that he did not request a Rule 609 hearing. He stated that his primary reason for not

20

requesting a hearing was the petitioner's insistence that he did not want to testify. Both trial counsel and co-counsel testified that the petitioner repeatedly asserted that he did not wish to testify. The post-conviction court found that the petitioner's specific indication that he did not wish to testify provided a rational explanation as to why trial counsel did not request a Rule 609 hearing. The post-conviction court found that the petitioner was advised as to the advantages and disadvantages of testifying and that he made a valid decision not to testify. The court also credited the testimony of trial counsel that the petitioner did not want to testify over the testimony of the petitioner to the opposite effect. A post-conviction court is in the best position to assess the credibility of the witnesses at a post-conviction hearing, and we conclude that the evidence does not preponderate against the findings of the post-conviction court.

Moreover, the petitioner has failed to demonstrate that the failure of counsel to request a 609 hearing caused him prejudice. The post-conviction court did not make a finding as to whether any or all of the petitioner's prior violent felony convictions would have been admissible for impeachment purposes. The record reflects that the petitioner had two prior felony convictions for aggravated assault and one conviction for attempted second degree murder that were within ten years of the prosecution. Regardless of the admissibility of the convictions for impeachment purposes, there was the possibility that the convictions could have been admitted had he testified at trial. *Gregory Hill v. State*, No. E2014-01686-CCA-R3-PC, 2015 WL 5275964, at *6 (Tenn. Crim. App. Sept. 10, 2015) (citing *Michael Braxton v. State*, No. M2006-01894-CCA-R3-PC, 2007 WL 1988141, at *4 (Tenn. Crim. App. July 10, 2007)). The petitioner could have opened the door to the convictions. *Id.* (citing *State v. Kendricks*, 947 S.W.2d 875, 883 (Tenn. Crim. App. 1996)). The convictions also may have been admitted as substantive evidence under Tennessee Rule of Evidence 404(b) to rebut a claim of self-defense. *Hill*, 2015 WL 5275964, at *6. Finally, even if the petitioner had taken the stand, his version of events was directly contradicted by all of the State's witnesses who viewed the stabbing. The witnesses testified that the petitioner initiated the attack, ambushing the victim as the victim attempted to leave. Witnesses also testified that the victim picked up an end table but put it down without striking the petitioner with it and that this occurred after the petitioner first attacked the victim. Additionally, there was not a knife recovered at the scene. The petitioner has not demonstrated a reasonable probability that had trial counsel conducted a Rule 609 hearing, he would have testified and that his testimony would have affected the outcome of his trial. The petitioner is not entitled to any relief.

## II. Testimony of the Petitioner

The petitioner argues that trial counsel was ineffective for advising him not to testify. He also argues that trial counsel was ineffective for failing to advise him that he

needed to testify in order to receive a self-defense instruction or to be convicted of a lesser included offense.

The post-conviction court found that trial counsel had a valid apprehension about calling the petitioner as a witness. Based upon the petitioner's demeanor as a witness at the post-conviction hearing and his reputation for having a quick temper, the fact that he was facing the death penalty, and the risk of opening the door to the underlying facts of his prior convictions, the court found that advising the petitioner that he needed to testify would have been "a piece of very dangerous advice." The court also found that, especially if it credited counsel's testimony that the petitioner was adamant about his desire not to testify, later advising the petitioner that he needed to testify would have placed counsel in a precarious position, implying that such advice may have been grounds for a legitimate claim of ineffective assistance of counsel. The court credited the testimony of trial counsel that he fully advised the petitioner of the advantages and disadvantages of testifying but that the choice ultimately belonged to the petitioner. Finally, the court found that the petitioner made a valid decision not to testify and that he did not have any questions or concerns when he informed the trial court that he did not wish to testify. We conclude that the petitioner has not shown that trial counsel performed deficiently.

We also conclude that trial counsel was not ineffective in not telling the petitioner that he needed to testify in order to guarantee a self-defense instruction or to be convicted of a lesser included offense. Stating that self-defense was "a longshot," trial counsel made the strategic decision to first argue for a conviction for voluntary manslaughter, and self-defense was a secondary theory. Both counsel testified that the petitioner was aware of and agreed to this defense strategy. Both counsel testified that they believed the proof was sufficient to warrant a self-defense instruction, and the post-conviction court found that it would not have permitted the defense to reopen the proof after denying the request for a self-defense instruction. Further, the court found that even if it had granted trial counsel's request for a self-defense instruction, such an instruction would not have affected the verdict. The court also found that the case presented "[a] classic legal argument" for the jury to determine whether the petitioner was guilty of first degree (premeditated) murder or voluntary manslaughter. The petitioner has failed to demonstrate that trial counsel performed deficiently or that the petitioner suffered any prejudice. The petitioner is not entitled to any relief as to this claim.

### III. Impeachment of Witnesses

The petitioner argues that trial counsel was ineffective for failing to impeach Ms. Williams with her prior convictions and prior dishonest acts. He contends that Ms.

Williams's testimony was particularly damaging and that, because she was the State's primary witness, it was imperative to attack her credibility and discredit her as a witness. He also contends that trial counsel was ineffective for failing to impeach Mr. Braddox with his prior citations.

Trial counsel testified that he was aware of Ms. Williams's prior convictions and acts of dishonesty and did not use them for impeachment purposes because he believed they had little probative value and would be poorly received by the jury. In regards to Mr. Braddox, trial counsel testified that he was not sure that he was aware of Mr. Braddox's charges for theft and driving without a license. The post-conviction court found that trial counsel made a reasonable strategic decision not to impeach Ms. Williams, and the court opined that it would not second guess the decision. The court also found that impeaching Ms. Williams with her prior convictions would not have affected the verdict in this case. On appeal, this court will not second guess strategic decisions made by trial counsel. *See Vaughn*, 202 S.W.3d at 123. The post-conviction court stated that it was unsure whether it would have been proper to attempt to impeach Mr. Braddox on the driving charge. Even if the theft charge were admissible as impeachment evidence, it would only impeach Mr. Braddox, and the testimony of the other witnesses was still consistent. We agree with the post-conviction court that trial counsel did not provide ineffective assistance of counsel. The petitioner is not entitled to any relief.

### IV. Motion for a Mistrial

The petitioner argues that trial counsel was ineffective for failing to request a mistrial after Ms. Carmichael testified that the petitioner made her uncomfortable. He contends that the testimony was irrelevant and prejudicial and that had trial counsel objected and preserved the issue on appeal, this court would have concluded that the testimony required a mistrial.

Trial counsel testified that he did not believe that Ms. Carmichael's testimony rose to the level of requesting a mistrial, and he was unsure that her testimony was even improper. The post-conviction court found that her testimony did not present any circumstances that would have caused the court to grant a mistrial. The court also found that the testimony did not prejudice the petitioner. The record does not preponderate against the findings of the post-conviction court, and the petitioner is not entitled to any relief.

### V. Closing Argument

23

The petitioner argues that trial counsel was ineffective for failing to object and failing to request a mistrial during the State's closing argument. He contends that the argument could have been perceived as a comment on his decision not to testify and that had the issue been preserved for appeal, this court would have found reversible error.

As part of rebuttal closing argument, the prosecutor stated, "What's really happening here, ladies and gentlemen, is that there is no defense to this case. That's why all you heard about was some type of minor inconsistencies." Both counsel testified that they did not believe the argument was a comment on the petitioner's decision not to testify. Trial counsel stated that he did not object for that reason. The post-conviction court found that the comment was made in response to the closing argument of the defense, which raised the issue that the petitioner was either guilty of voluntary manslaughter or acted in self-defense. The court found that the argument was not a comment on the petitioner's decision not to testify and that it would not have been so perceived by the jury. The record does not preponderate against the findings of the post-conviction court. The petitioner is not entitled to any relief.

## VI. Cumulative Error

In his final claim, the petitioner argues that the cumulative effect of counsel's deficient performance warrants post-conviction relief. In order for the cumulative error doctrine to apply, there must be more than one error committed at trial. *State v. Hester*, 324 S.W.3d 1, 77 (Tenn. 2010). As we have found no deficiencies in trial counsel's performance, the doctrine affords the petitioner no relief.

## CONCLUSION

Based upon the foregoing, the judgment of the post-conviction court is affirmed.

_____
JOHN EVERETT WILLIAMS, JUDGE

24